

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____

**Signed April 18, 2020**   **United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In re: § | |
| § | Case No. 17-42482-ELM-7 |
| STEPHEN C. JENKINS, § | |
| § | Chapter 7 |
| Debtor. § | |

## MEMORANDUM OPINION AND ORDER*

Before the Court is the *Trustee's Objection to Debtor's Claim of Exemption* [Docket No. 58] (the "**Objection**") filed by Areya Holder Aurzada (the "**Trustee**"), the chapter 7 trustee in this case. Pursuant to the Objection, the Trustee objects to the homestead exemption claimed by Stephen C. Jenkins (the "**Debtor**"), the chapter 7 debtor, with respect to the monthly tenancy at will that he allegedly holds in real property located at 1709 Tremont Avenue in Fort Worth, Texas (the "**Tremont Property**").

The Debtor timely filed a response in opposition to the Objection [Docket No. 60] (the "**Response**"). The parties have also filed briefs in support of their respective positions.[1] On

---

* Amending Docket No. 78 to correct certain typographical errors.

[1] *See* Docket Nos. 71, 74 and 75.

September 23, 2019, the Court conducted a hearing on the Objection, at which time the Court received evidence, including (at the parties' request) the entire record from the trial in Adversary No. 17-4155 (the "**Fraudulent Transfer Action**"),[2] and heard arguments of counsel.

Having now considered the Objection, the Response, the parties' respective briefing, the evidence, and the arguments of counsel, the Court issues its ruling on the Objection, as follows:[3]

## JURISDICTION

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## FACTUAL BACKGROUND

**A.     The Debtor's House Remodeling Business and Acquisition of the Tremont Property**

For roughly 24 years prior to his bankruptcy filing, between 1992 and 2016, the Debtor worked as a self-employed contractor within the house construction and remodeling industry. He operated under the names Steve Jenkins Construction Co., Steve Jenkins Remodeling, and 3 Point Construction LLC.[4]

During the latter part of this time frame, the Debtor, along with Robert Bond ("**Bond**"), his uncle, and Chris Hill ("**Hill**"), a close friend of Bond, worked together on several "house flipping"

---

[2] Exhibits of the Trustee introduced into evidence at the hearing will be referred to herein as "Trustee's Exh. ___", whereas exhibits of the Trustee introduced into evidence at the trial in Adversary No. 17-4155 will be referred to as "Adversary Trustee's Exh. ___."

[3] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

[4] *See* Adversary Trustee's Exh. 5 (Statement of Financial Affairs Part 11, Question 27).

projects, whereby the Debtor would locate a distressed property to acquire, Bond and/or Hill would provide the financing for the Debtor's acquisition and remodeling of the property, and then the Debtor would resell the property, with the financing provided by Bond and/or Hill to be repaid out of the sales proceeds and any remaining profit (if any) to be pocketed by the Debtor. The Tremont Property was the last of these "house flipping" projects.

On March 30, 2015, the Debtor purchased the Tremont Property with a $325,000 loan provided by Hill (the "**Hill Loan**"). The deed to the property was taken in the Debtor's name alone.[5] Inasmuch as the promissory note executed by the Debtor to Hill neither provided for periodic principal and interest payments nor a maturity date, it was effectively a demand note.[6] The note was secured by a deed of trust lien on the Tremont Property.[7]

**B.    *The Debtor Shuffles His Property Ownership as His Business Struggles***

By the time of the Tremont Property acquisition, serious cracks were developing in the foundation of the Debtor's remodeling business. As matters continued to deteriorate, the Debtor and his wife Elizabeth Jenkins ("**Elizabeth**" and together with the Debtor, the "**Jenkinses**") decided to sell their existing residence at 6299 Bennett Lawson Road, Mansfield, Texas 76063 (the "**Bennett Lawson Property**").

On October 15, 2015, the sale closed and the Jenkinses moved out.[8] While the Debtor had previously committed to repay $100,000 of the Hill Loan out of the Bennett Lawson Property sales proceeds, by the time of the closing the Debtor could only afford to commit $50,000 of the sales

---

[5] *See* Adversary Trustee's Exh. 20(a), at p. 2 (Allegiance title report).

[6] *See* Adversary Trustee's Exh. 7, at p. 9 (Hill note).

[7] Adversary Trustee's Exh. 7 (Deed of Trust relating to Hill Loan); PTO, ¶ II.9.

[8] *See* PTO, ¶ II.10; Adversary Trustee's Exh. 6 (final settlement statement with respect to sale of Bennett Lawson Property).

proceeds due to the extent of his financial troubles. Hill accepted the lesser amount but required the Debtor to promptly refinance the balance.

With the assistance of a loan broker, the Debtor thereafter found a new lender in Chris Dance ("**Dance**"). With the understanding that the Tremont Property was one of the Debtor's "house flipping" projects, Dance agreed to a $295,000 short-term loan (the "**Dance Loan**") to enable the Debtor to pay off the Hill Loan, complete the renovations, and then resell the property, with the Dance Loan to be paid off out of the sales proceeds.

On November 20, 2015, the Debtor closed on the Dance Loan. The Dance Loan was evidenced by a promissory note (the "**Dance Note**") secured by a deed of trust lien on the Tremont Property.[9] Under the terms of the Dance Note, the Debtor was obligated to make monthly interest payments until the note's maturity on December 1, 2016, at which time all unpaid principal and interest would be due in a single balloon payment.[10]

In connection with obtaining the Dance Loan, the Jenkinses executed documentation to confirm that the Tremont Property was the separate, non-homestead, commercial property of the Debtor. First, the Debtor executed an Affidavit and Designation of Commercial Purpose to affirm (a) that neither he nor Elizabeth resided at the property, and that neither of them would occupy the property as long as the Dance Loan was unpaid, (b) that no part of the property constituted exempt property, and (c) that the proceeds of the loan would be used exclusively for business/commercial purposes and not for any personal, household or family use.[11] Second, Elizabeth executed an Agreement and Joinder of Spouse to, among other things, confirm that the Tremont Property "shall

---

[9] *See* PTO, ¶¶ II.11 and 13.

[10] *See id.*, ¶ II.14; Adversary Trustee's Exh. 9 (Dance Note).

[11] *See* Adversary Trustee's Exh. 16 (Affidavit and Designation of Commercial Purpose).

be deemed to be or to have remained the sole and separate property of [the Debtor]."[12] Finally, despite the Jenkinses' sale of the Bennett Lawson Property over a month earlier and their immediate move out of the property upon closing, the Debtor and Elizabeth each executed a Homestead Designation Affidavit to confirm their designation of the Bennett Lawson Property as their homestead and to renounce and disclaim any homestead claim to the Tremont Property.[13]

C. **The Jenkinses Move Into the Tremont Property In Contravention of the Dance Loan Representations**

In December 2015, following the closing of the Dance Loan and the completion of renovations to the Tremont Property, the Jenkinses moved into the Tremont Property in contravention of the representations that they had made to Dance. According to the Debtor, he came to view the Tremont Property as the new Jenkins family residence and homestead only after the Dance Loan had closed.

Elizabeth, on the other hand, testified that, before the Dance Loan closed, the Jenkinses had planned to move into the Tremont Property. In fact, she bluntly admitted that the Jenkinses misrepresented their intentions to Dance so that they could save the Tremont Property as their home. Further evidencing their intent to move into the property upon sale of the Bennett Lawson Property is the fact that, during the roughly five- to six-week period following their sale of the Bennett Lawson Property and the completion of renovations to the Tremont Property, the Jenkinses lived in a hotel as opposed to an apartment, house or other rental property.

---

[12] *See* Adversary Trustee's Exh. 14, ¶ 2 (Agreement and Joinder of Spouse).
[13] *See* Adversary Trustee Exh. 15 (Homestead Designation Affidavits).

**D.     The Debtor Defaults on the Dance Loan and Shuts Down His Business; The Jenkinses Develop a New Strategy to Save the Tremont Property**

Throughout 2015, the Debtor continued to lose large amounts of money on his "house flipping" projects. Ultimately, the Debtor failed to make the first two payments on the Dance Note, due in January and February of 2016. Thus, Dance declared a default and provided written notice of his intent to foreclose on the Tremont Property. While Dance ended up agreeing to hold off on the foreclosure due to catch-up payments that the Debtor cobbled together with funds from his mother, it would only be a matter of time before foreclosure would be back in the picture.

At or around this time in early 2016, the Debtor decided to completely shut down his home construction and remodeling business. And with the loss of the Tremont Property looming, Elizabeth largely took over the family's finances and began to look for a new lender.

Contributing to the fact that their finances were in shambles, the Jenkinses had the additional problem of a prior foreclosure on their record. Consequently, Elizabeth was unsuccessful in her search for a new lender. Thus, with no other source of capital available, the Jenkinses resorted to the development of a new strategy. Using their two adult children (the "**Jenkins Children**"), whose credit was untarnished, the plan was to refinance the Dance Loan by having the Jenkins Children purchase the Tremont Property with financing obtained in their own names. Eventually, financing was lined up with Quicken Loans.

**E.     The Tremont Property is Sold to the Jenkins Children**

On September 19, 2016 (the "**Closing Date**"), the sale of the Tremont Property to the Jenkins Children closed.[14] In relation to the agreed-upon sales price for the property, the Debtor provided a "gift of equity" reduction to the Jenkins Children (the "**Gift of Equity**"). The Gift of

---

[14] PTO, ¶ II.28.

Equity would later become the primary target of avoidance by the Trustee in the Fraudulent Transfer Action.

As part of the closing, the Jenkinses[15] executed a general warranty deed to evidence transfer of title to the Jenkins Children (the "**Property Deed**").[16] Notably, the Jenkinses neither retained any interest in the Tremont Property under the Property Deed nor executed a lease with the Jenkins Children following the Closing Date. However, the Jenkinses continued to occupy the Tremont Property with the permission of the Jenkins Children and, in fact, made all of the ongoing mortgage payments.[17]

### F. The Debtor's Concealment of the Sale

On June 13, 2017 (the "**Petition Date**"), the Debtor initiated the Bankruptcy Case with the filing of his voluntary petition for relief under chapter 7 of the Bankruptcy Code.

On June 27, 2017, the Debtor filed his sworn Statement of Financial Affairs ("**SOFA**").[18] Question 18 of the SOFA asked the following: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" In response, the Debtor failed to disclose sale of the Tremont Property to the Jenkins Children.[19]

On August 21, 2017, in advance of the continued meeting of creditors under section 341 of the Bankruptcy Code (the "**341 Meeting**"), the Debtor filed an amended sworn SOFA (the "**Amended SOFA**").[20] This time the Amended SOFA disclosed transfer of the Tremont Property

---

[15] Because the Tremont Property was acquired during the marriage of the Debtor and Elizabeth, Allegiance understandably required both the Debtor and Elizabeth to execute the Property Deed.

[16] *See* Adversary Trustee's Exh. 20(g) (Property Deed).

[17] *See id.*, ¶ II.64.

[18] *See* Adversary Trustee's Exh. 3 (SOFA).

[19] *See id.*, at p. 6 (SOFA Part 7, Question 18).

[20] *See* Adversary Trustee's Exh. 4 (Amended SOFA).

to the Jenkins Children.[21] Based upon the newly-disclosed transfer, the Trustee questioned the Debtor about the transfer at the continued 341 Meeting. Among other things, the Debtor falsely testified under oath that he had purchased the Tremont Property in October 2015 with, among other funds, approximately $175,000 in cash from the sale of the Bennett Lawson Property.[22]

G.     *The Debtor's Shifting Position Regarding the Tremont Property and Exemptions*

On June 27, 2017, at the same time as filing his SOFA, the Trustee filed his first set of sworn schedules of assets and liabilities. In response to Question 1 of Part 1 of Schedule A/B of the schedules ("**Schedule A/B**") – "Do you own or have any legal or equitable interest in any residence, building, land, or similar property?" – the Debtor answered "No".[23] Separately, in Schedule C of the schedules ("**Schedule C**"), the Debtor made the election to claim federal exemptions and did not list any interest in the Tremont Property.[24]

Thereafter, while the Debtor filed his Amended SOFA to disclose transfer of the Tremont Property in advance of the continued 341 Meeting, he neither amended his Schedule A/B to reflect an interest in the Tremont Property nor amended his Schedule C to assert an exemption in relation to the Tremont Property.

Later, on October 23, 2017, however, the Debtor filed an amended sworn Schedule A/B (the "**Amended Schedule A/B**")[25] and an amended sworn Schedule C (the "**Amended Schedule C**").[26] In the Amended Schedule A/B, the Debtor continued to respond "No" to the question of whether he owned or had any legal or equitable interest in any residence, building, land, or similar

---

[21] *See id.*, at p. 7 (Amended SOFA Part 7, Question 18).

[22] PTO, ¶¶ II.50-II.51.

[23] Trustee's Exh. 1 (Schedule A/B).

[24] *See* Adversary Trustee's Exh. 1, at pp. 8-9 (Schedule C).

[25] Trustee's Exh. 2 (Amended Schedule A/B).

[26] Adversary Trustee's Exh. 2, at pp. 8-9 (Amended Schedule C).

property.[27] And in Amended Schedule C, the Debtor continued to claim federal exemptions and did not list any interest in the Tremont Property.[28]

In November 2017, the Trustee initiated the Fraudulent Transfer Action against the Jenkins Children to pursue avoidance and recovery of, among other things, the Gift of Equity. In advance of trial, the Jenkins Children filed a brief in which the Jenkins Children presented a defensive argument dependent upon the Tremont Property's exempt status.[29] Counsel of record for the Jenkins Children in the Fraudulent Transfer Action is the same as counsel of record for the Debtor in this bankruptcy case.

On the evening before the day on which the trial of the Fraudulent Transfer Action commenced, the Debtor filed a further amended sworn Schedule A/B (the "**Second Amended Schedule A/B**")[30] and a further amended sworn Schedule C (the "**Second Amended Schedule C**").[31] Pursuant to the Second Amended Schedule A/B, filed nearly 20 months after his original sworn Schedule A/B, the Debtor dramatically shifted course and for the first time answered "Yes" to the question of whether he owned or had any legal or equitable interest in any residence, building, land, or similar property, disclosing a "monthly tenancy at will" in the Tremont Property.[32] And pursuant to the Second Amended Schedule C, similarly filed nearly 20 months after his original sworn Schedule C, the Debtor dramatically shifted course by changing his exemption election from the federal exemptions to the state exemptions and by claiming the

---

[27] Trustee's Exh. 2 (Amended Schedule A/B Part 1, Question 1).

[28] *See* Adversary Trustee's Exh. 2, at pp. 8-9 (Amended Schedule C).

[29] *See* Docket No. 46 in Adversary No. 17-4155, § III.B., at pp. 6-8 (arguing "no harm, no foul" exemption-based defense).

[30] *See* Docket No. 57, at pp. 1-8 (Second Amended Schedule A/B).

[31] *See id.*, at pp. 9-10 (Second Amended Schedule C).

[32] *See* Second Amended Schedule A/B (Part 1, Question 1).

monthly tenancy at will in the Tremont Property as exempt homestead property under the Texas Constitution and Texas Property Code.

On March 12, 2019, the Trustee filed the Objection at issue in this proceeding.

### DISCUSSION

#### A. *The Texas Homestead Exemption*

In Texas, homestead property is exempt from most types of creditor claims. Not only is it statutorily protected,[33] it is also constitutionally protected under the Texas Constitution.[34] As described by the Fifth Circuit, "[h]omesteads are favorites of the law, and are liberally construed by Texas courts."[35]

Neither the Texas Constitution nor the Texas Property Code clearly defines what is meant by "homestead."[36] In the case law, however, it has generally been described as "the dwelling house constituting the family residence, together with the land on which it is situated and the appurtenances connected therewith."[37] In addition to the question of what makes particular property "homestead," there is also the question of what sort of right to possession of, or interest in, the property is required for the right or interest to qualify for homestead status. In this regard, "[u]nder Texas law a homestead claimant need not hold the property in fee simple in order to invoke the [homestead] exemption. '[A]ny possessory interest in a lot or lots, the fee-simple title

---

[33] *See* Tex. Prop. Code § 41.001(a).

[34] *See* Tex. Const. art. XVI, § 50.

[35] *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 316 (5th Cir. 2013).

[36] *See Norris v. Thomas*, 215 S.W.3d 851, 853 (Tex. 2007) ("Neither the Texas Constitution nor the Property Code defines 'homestead' with specificity").

[37] *Resolution Trust Corp. v. Olivarez*, 29 F.3d 201, 204 (5th Cir. 1994) (quoting *Lifemark Corp. v. Merrit*, 655 S.W.2d 310, 314 (Tex. App. – Houston [14th Dist.] 1983, writ ref'd n.r.e.)); *see also Rock Island Plow Co. v. Alten*, 116 S.W. 1144, 1145 (Tex. 1909) (describing homestead as "embrac[ing] the family residence or home as well as a place of business of the head of the family"); Tex. Const. art. XVI, § 51 ("the homestead in a city, town or village shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant"); Tex. Prop. Code § 41.002 (referring to use of property as home or both a home and a place to exercise a calling or business).

not being required to support it, coupled with the requisite occupancy by the husband and his family, is sufficient to support a homestead claim.'"[38] Thus, a leasehold interest, for example, has been long-recognized as a type of interest in real property sufficient to support a homestead claim.[39] While seemingly broad, some Texas courts have suggested that the bare *right to possess* the property is insufficient, requiring instead that the homestead claimant hold some form of legally recognizable possessory *interest* in the property in order for the property to qualify for homestead status.[40] Either way, the possessory right or interest must be an *existing* possessory interest. "[O]ne who holds only a future interest in property with no present right to possession is not entitled to homestead protection in that property."[41]

A homestead claimant bears the initial burden of establishing the homestead status of property.[42] In addition to establishing the existence of a present possessory right or interest in the property at issue, the homestead claimant must also establish the "homestead" nature of the property through evidence of: (1) overt acts of homestead usage; and (2) the claimant's intention to claim the property as a homestead.[43] Once the homestead claimant has made a *prima facie* case

---

[38] *Olivarez*, 29 F.3d at 205 (quoting *Capital Aggregates, Inc. v. Walker*, 448 S.W.2d 830, 837 (Tex. Civ. App. – Austin 1969, writ ref'd n.r.e.)).

[39] *See, e.g., Allen v. Ashburn*, 65 S.W. 45 (Tex. Ct. App. 1901).

[40] *See Olivarez*, 29 F.3d at 206 & n.6 ("A number of Texas cases suggest that absence of record title completely negates any homestead right, despite occupancy of the property by the homestead claimants") (citing, *inter alia*, *Greene v. White*, 153 S.W.2d 575, 579, 586 (Tex. 1941) (homestead exemption unavailable "even though [claimants] were … living on the land and claiming it as homestead" with the "permission or acquiescence" of the owner, "for they could have no homestead right or interest in land to which they had no title"); *Rettig v. Houston West End Realty Co.*, 254 S.W. 765, 767-68 (Tex. Comm'n App. 1923, judgm't adopted); and *Williams v. Corpus Christi Bank & Trust Co.*, 104 S.W.2d 56, 57 (Tex. Civ. App. – San Antonio 1937, writ ref'd) ("the fact that [the claimants] continued to use the land at the sufferance of the grantees [after conveying the land to the grantees]" did not change the fact that the property was no longer homestead property)).

[41] *Laster v. First Huntsville Props.*, 826 S.W.2d 125, 130 (Tex. 1991).

[42] *Perry*, 345 F.3d at 311 (citing *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972)).

[43] *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 159 (Tex. 2015); *see also Wallace v. Rogers (In re Rogers)*, 513 F.3d 212, 223 n.9 (5th Cir. 2008).

in favor of homestead status, the objecting party has the burden of demonstrating that the homestead rights have been terminated.[44]

### B. Trustee's Objections to Debtor's Homestead Claim

The Trustee raises three objections to the Debtor's homestead claim. First, she argues that "one cannot assert a homestead exemption in property he does not hold title to,"[45] implicitly arguing that a monthly tenancy at will does not constitute an interest in property, or at least the type of interest in property that is sufficient to qualify for homestead status. Second, the Trustee argues that, even if a monthly tenancy at will can qualify for homestead status, the Debtor does not hold any such interest as evidenced by his previous sworn disclosures in the case and also based upon the Debtor's failure to qualify as a tenant.[46] Finally, the Trustee appears to argue that the exemption should be denied because any homestead right that exists in the Debtor's favor is ineffective in relation to the Trustee's allegedly superior title in the Tremont Property.[47] Each of these objections is considered in turn.

#### 1. Availability of Homestead Protection for Monthly Tenancy at Will

In support of her assertion that there can be no claim to homestead in a tenancy at will, the Trustee cites *In re Brunson*, 498 B.R. 160 (Bankr. W.D. Tex. 2013). In *Brunson*, one of the debtors in bankruptcy obtained a prepetition gift deed to certain real property from her father. While the deed provided for the transfer of a fee simple interest in the property, the transfer was subject to a reservation of "the full possession, benefit and use of" the property by the father during the remainder of his life. Thus, the debtor, who (along with her co-debtor husband) was currently

---

[44] *Perry*, 345 F.3d at 311.

[45] *See* Objection, ¶ 13.

[46] *See id.*, ¶¶ 14 and 16.

[47] *See id.*, ¶ 15.

residing at the property along with her father, was occupying the property not as the present fee interest owner, but rather with the father's permission. Nevertheless, following their bankruptcy filing, the debtors claimed the full fee interest in the property as exempt homestead property.[48] Asserting that the fee interest in the property was not a present interest, but rather a future interest, the trustee objected to the claimed exemption.[49]

In analyzing the homestead claim, the court in *Brunson* considered, among other things, the nature of the debtors' permissive occupancy of the property, comparing it to both tenancies and licenses. In considering whether it constituted a tenancy, the court explained that "to be a tenant, one has to have exclusive right of possession in a property."[50] In considering whether the debtors' occupancy was, instead, limited to a license to use the property, the court explained that licensees and lodgers (such as hotel guests) are entitled to fewer rights.[51] A hotel guest, for example, has only a right to use of the property and no exclusive, possessory estate in the property.[52]

In relation to these differences, the court additionally observed that the distinction becomes somewhat blurred where the title owner and possessory interest holder are family members. In those situations, the family member possessory right/interest cohabitant of the property has typically been referred to as a "tenant" irrespective of the true nature of his or her possessory right

---

[48] *See Brunson*, 498 B.R. at 162.

[49] *See id.* at 162-63.

[50] *See id.* at 164 (and citations in relation thereto).

[51] *See id.*

[52] *Mallam v. Trans-Texas Airways*, 227 S.W.2d 344, 346 (Tex. Civ. App. – El Paso 1949, no writ); *see also McBride v. Hosey*, 197 S.W.2d 372, 374-75 (Tex. Civ. App. – El Paso 1946, writ ref'd n.r.e.) (explaining that, unlike the requirements in the case of a tenancy, eviction is not required to eject a hotel guest).

or interest.[53] In any event, the court importantly explained that the difference between tenancies, on the one hand, and licenses and mere lodging arrangements, on the other, is significant because while "[t]enants have an exclusive right of possession that gives them limited homestead rights; licensees and lodgers have no such exclusive right to possession and, correspondingly, no homestead rights."[54]

Ultimately the court found it unnecessary to determine whether the debtors' occupancy of the property at issue constituted a tenancy or license because, either way, the debtors could not protect the claimed future fee simple interest in the property as homestead predicated on their current possessory interest or rights.[55] Thus, while the guidance provided by *Brunson* is helpful, it does not directly support the Trustee's contention that a tenancy at will fails to qualify for homestead protection. In fact, if anything, *Brunson* suggests that a tenancy at will may qualify for "limited homestead rights."[56]

The Debtor takes a slightly different approach. He asserts that any type of leasehold interest will qualify for homestead protection. Thus, according to the Debtor, a tenancy at will, being one form of leasehold interest, will qualify. In support of his position, the Debtor relies upon, among other cases, the case of *Capital Aggregates, Inc. v. Walker*, 448 S.W.2d 830 (Tex. Civ. App. – Austin 1969, writ ref'd n.r.e.). In *Walker*, the homestead claimants owned a leasehold interest in a trailer park in Austin, Texas. After purchasing a trailer home, they permanently affixed the trailer home to their leased property and occupied the trailer home as their permanent

---

[53] *Brunson*, 498 B.R. at 168 ("the Court has not located Texas cases that explicitly characterize close family members consensually cohabitating with a current estate holder as mere licensees, and some cases seem to describe such family members as 'tenants' (perhaps merely due to imprecision or what is a now outdated usage of the term)").

[54] *Id.* at 165.

[55] *See id.* at 168-70.

[56] *Id.* at 165; *see also id.* at 163 ("In practice, … the homestead interest of a tenant at will provides little protection").

Page 14

residence. Later, a judgment creditor sought to pursue execution against the trailer home. The homestead claimants asserted that the trailer home, as part of the leasehold estate, was exempt homestead property.[57]

One of the issues on appeal was whether the homestead claimants really owned a leasehold estate.[58] In relation to such issue, the evidence was that the homestead claimants had placed their trailer home in the trailer park under a verbal month to month rental agreement with the park landlord. Based upon the existence of the agreed-upon month-to-month lease, the court explained: "It is our opinion that a month to month tenancy is a sufficient interest in realty to sustain a homestead claim."[59] In considering the authorities presented by the judgment creditor in opposition to such position and the history of homestead law, the court further elaborated: "giving effect to the plain intent of the Homestead Act, any possessory interest in a lot or lots, the fee-simple title not being required to support it, coupled with the requisite occupancy by the husband and his family, is sufficient to support a homestead claim."[60]

While both the *Brunson* and *Walker* cases are insightful, the Court finds most directly on point the Fifth Circuit's opinion in *Perry v. Dearing (In re Perry)*, 345 F.3d 303 (5th Cir. 2003). In *Perry*, the debtor conveyed certain rural property on which he lived and operated his business to a corporation that he had organized. Thereafter, he continued to reside and operate his business on the land, but without any title to, or leasehold interest in, the property. Later, when the debtor asserted a homestead exemption right to the property in bankruptcy, the exemption was challenged.[61] In analyzing the challenge, the Fifth Circuit first observed that the debtor's status

---

[57] *See Walker*, 448 S.W.2d at 831-32.

[58] *See id*. at 835.

[59] *Id*.

[60] *Id*. at 837.

[61] *See Perry*, 345 F.3d at 307-308.

post-transfer became one of a tenant-at-will.[62] And with respect to the tenancy at will, the court found that the "[debtor] may thus claim a *limited* homestead interest in the 26-acre tract premised upon his at-will tenancy. A homestead interest in the possessory estate of a tenancy at will protected [the debtor's] possessory interest in the 26-acre tract against all creditors – except the owner, or one with better title."[63]

Accordingly, because the Fifth Circuit has recognized that a tenancy at will may qualify for homestead status, the Trustee's first basis for objection will be overruled.

### 2. *Debtor's Claimed Tenancy at Will*

Next, the Trustee argues that the Debtor has failed to prove that he legitimately and legally holds a tenancy at will in the Tremont Property. In this regard, she not only emphasizes the fact that the Debtor failed to disclose any such interest until the eve of trial in the Fraudulent Transfer Action, but she also asserts that the Debtor is not a true "tenant" for purposes of finding that a tenancy at will exists.

First, with respect to the lack of prior disclosure, the Court is likewise troubled by the seemingly strategic pivot by the Debtor on the eve of trial to assert the new homestead claim. Given the significant amount of time that had transpired after the initial sworn schedules, the Trustee's focus on the Tremont Property in the Fraudulent Transfer Action, and the Jenkins Children's reliance on an exemption-based litigation defense in the action, the Court finds the late disclosure to have been driven by the litigation. That said, while a lack of transparency and failure to timely disclose can have serious ramifications to a debtor,[64] because the Bankruptcy Rules

---

[62] *Id*. at 315.

[63] *Id*. (emphasis in orig.).

[64] *See, e.g.*, 11 U.S.C. § 727(a)(4).

permit amendment of the schedules at any time prior to the closing of the case,[65] the Court must nevertheless evaluate the newly-claimed exemption on the merits.[66]

To evaluate whether the Debtor holds a monthly tenancy at will, it is first important to understand what constitutes a tenancy at will. Courts have generally found the occupancy of a residence without holding any title to the property, but with the express permission of the title owner without fixed terms (*e.g.*, duration or rent) to constitute a tenancy at will.[67]

Relying again on *Brunson*, however, the Trustee asserts that an additional requirement must be met – the holder of the tenancy must qualify as a "tenant." As explained by the court in *Brunson*: "Crucially, to be a tenant, one has to have exclusive right of possession in a property."[68] With this in mind, in the Debtor's case, at no point since the Petition Date have the Debtor and his wife had the right to possess the Tremont Property to the exclusion of the Jenkins Children. In fact, one of the children (Tyler) testified at the trial in the Fraudulent Transfer Action that he was also residing at the property. Thus, the Trustee asserts that the lack of the right to exclusive possession means that the Debtor was never a tenant and that his occupancy of the property never constituted a tenancy.

---

[65] *See* Fed. R. Bankr. P. 1009(a).

[66] *See also Law v. Siegel*, 134 S.Ct. 1188, 1196-97 (2014) (finding no basis within the Bankruptcy Code to disallow an exemption based upon the debtor's fraudulent concealment).

[67] *See Olivarez*, 29 F.3d at 205 ("Because [the claimants] occupied the property with [the title owner's] permission, but without any title to the property, their interest in the premises was a tenancy at will"); *Coinmach Corp. v. Aspendwood Apartment Corp.*, 417 S.W.3d 909, 915 (Tex. 2013) ("A tenant at will is a holdover tenant who 'holds possession with the landlord's consent but without fixed terms (as to duration or rent)'") (quoting Black's Law Dictionary 1604 (9th ed. 2009)); *ICM Mortg. Corp. v. Jacob*, 902 S.W.2d 527, 530 (Tex. App. – El Paso 1994, writ denied) ("One in lawful possession of premises by permission of the owner or landlord and for no fixed term is a tenant at will"); *DeGrassi v. DeGrassi*, 533 S.W.2d 81, 87 (Tex. Civ. App. – Amarillo 1976, writ ref'd n.r.e.) ("The occupancy of the residence by the [claimants] after the conveyance [of the property by the claimants to the grantee] was with the permission of [the grantee] and constituted a tenancy at will").

[68] *Brunson*, 498 B.R. at 164; *see also Brooks v. Blue Ridge Ins. Co.*, 677 S.W.2d 646, 649, 652 (Tex. App. – Amarillo 1984, writ ref'd n.r.e.) ("exclusive possession of the property" is "one of the constituting and essential elements of tenancy"); *Tossow v. State*, No. 03-02-308, 2003 WL 738331, at *2 (Tex. Civ. App. – Austin Mar. 6, 2003, no pet.) ("Tenancy implies a right of possession in the tenant exclusive even of the landlord. The *right of exclusive possession* is one of the *essential* elements of tenancy") (emphasis in orig.).

While the Court agrees with the Trustee's point that one of the characteristics of a tenancy is the right to exclusive possession,[69] the Court disagrees with the extent of the conclusion drawn by the Trustee therefrom. In any tenancy relationship, the title owner and tenant may mutually agree to the cohabitation of the property by both the owner and the tenant. As suggested in *Brunson*, particularly where family members are involved, this is where a blurring of the lines seems prevalent.[70] Thus, while it is important to consider whether a right to exclusive possession exists in determining whether a possessory right constitutes a tenancy or mere license, a more meaningful inquiry in a familial owner-possessor context is whether the possessor has the right to exclude *other third parties* from possession. Where the possessor has such a right of exclusion, then the possessory right has the quality of a tenancy. Where only the title owner has such right of exclusion, on the other hand, then the possessory right has the quality of a license.

In the Debtor's case, the testimony was clear that, while the Debtor and the Jenkins Children clearly agreed to and effectuated a transfer of the Tremont Property to the Jenkins Children, they also clearly agreed to the Debtor maintaining authority and control with respect to possessory rights affecting the property post-closing. Accordingly, the Trustee's objection to the claimed exemption on the basis of the Debtor's alleged failure to attain tenant status will be overruled.

Relatedly, however, the Debtor does assert more than a pure tenancy at will; he asserts a *monthly* tenancy at will. Presumably the Debtor ties this timing component of the claimed tenancy to the fact that the Jenkinses have been making all monthly mortgage payments post-closing.

---

[69] *See, e.g., Tips v. United States*, 70 F.2d 525, 526-27 (5th Cir. 1934) ("A tenancy involves an interest in the land passed to the tenant and a possession exclusive even of the landlord except as the lease permits his entry, and saving always the landlord's right to enter to demand rent or to make repairs. A mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive possession of it being given, is but a license").

[70] *See Brunson*, 498 B.R. at 168.

However, there is no evidence in the record of either an agreement on the part of the Debtor to continue making such mortgage payments on a monthly basis or, more importantly, an agreement on the part of the Jenkins Children to a month-to-month term of the tenancy at will. Therefore, the Trustee's objection to the Debtor's claimed homestead exemption in a monthly tenancy at will in the Tremont Property will be sustained to the extent of the Debtor's asserted month-to-month interest in such tenancy at will.

### *3. Trustee's Alleged Superior Interest in Tremont Property*

Finally, the Trustee objects to the homestead claim on the basis that any homestead interest held by the Debtor is subordinate to the Trustee's interest in the Tremont Property. In this regard, while fee simple ownership in property is not necessary for a claim of homestead protection, as indicated above, a homestead claimant's exemption rights will only extend as far as the claimant's interest in the property. As explained by the court in *Olivarez*, it is "a well-recognized principle of law that one's homestead right in property can never rise any higher than the right, title, or interest that he owns in the property attempted to be impressed with a homestead right."[71] Thus, in the case of the Debtor, the Debtor's homestead right with respect to the tenancy at will in the Tremont Property will always, for example, be subordinate to both the fee simple interest in the property held by the Jenkins Children and the lienholder interest in the property held by Quicken.

With the foregoing in mind, the Trustee appears to suggest that she holds a superior right in the Tremont Property based upon the claims asserted in the Fraudulent Transfer Action. The Court has contemporaneously issued its ruling in the Fraudulent Transfer Action and none of the relief provided thereby grants to the Trustee an interest in the Tremont Property, much less a superior interest. Accordingly, the Trustee's objection on this basis will be denied.

---

[71] *Olivarez*, 29 F.3d at 205 (quoting *Sayers v. Pyland*, 161 S.W.2d 769, 773 (1942)).

## *CONCLUSION*

At all times from and after the Petition Date, the Debtor has maintained possession of the Tremont Property, used the Tremont Property as his family home, and (notwithstanding the failure to timely disclose it) treated whatever possessory interest that he holds in the property as his exempt homestead property under Texas exemption laws. In connection with this proceeding, the evidence has also established that the nature of such possessory interest is an immediately terminable tenancy at will in the Tremont Property. Thus, the Debtor's claimed homestead exemption to such extent will be upheld. To the extent that the Debtor has claimed any greater interest in the Tremont Property as his exempt homestead property (*e.g.*, by claiming a *monthly* tenancy at will), however, the Trustee's Objection will be sustained.

## *ORDER*

Based upon the foregoing, it is hereby:

**ORDERED, ADJUDGED AND DECREED** that the Trustee's Objection be and is hereby SUSTAINED, and the Debtor's claimed exemption of a monthly tenancy at will in the Tremont Property be and is hereby disallowed, to the extent of the Debtor's asserted month-to-month interest in such tenancy at will, the claimed exemption being limited and allowed solely with respect to an immediately terminable tenancy at will interest held by the Debtor in the Tremont Property; it is further

**ORDERED, ADJUDGED AND DECREED** that, in all other respects, the Trustee's Objection be and is hereby OVERRULED; and it is further

**ORDERED, ADJUDGED AND DECREED** that the Court shall retain jurisdiction to hear and determine any disputes with respect to the interpretation and enforcement of this Memorandum Opinion and Order.

### END OF MEMORANDUM OPINION AND ORDER ###